**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

CHANTAY ELESE COLLINS,   Case No: 1:13-cv-756

        Plaintiff,   Barrett, J.
v.   Bowman, M.J.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff Chantay Elese Collins filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents two claims of error for this Court's review. As explained below, I conclude that the ALJ's finding of non-disability should be REVERSED, because it is not supported by substantial evidence in the administrative record.

**I. Summary of Administrative Record**

Plaintiff filed applications for disability insurance benefits ("DIB") and for supplemental security income ("SSI") on September 17, 2009, alleging disability beginning December 31, 2008 based on a combination of interstitial cystitis of the bladder and kidneys ("IC"), with multiple other physical and mental impairments. Her applications were denied initially and upon reconsideration, after which she timely requested an evidentiary hearing before an administrative law judge ("ALJ"). Ultimately, two hearings were held.

On July 12, 2011, Plaintiff and a vocational expert ("VE") appeared and testified

at a hearing held before ALJ Dwight Wilkerson. (Tr. 54-78). During that hearing, she amended her disability onset date to October 9, 2009, due to the fact that she had continued to work into 2009. (Tr. 58). At the conclusion of the first hearing, ALJ Wilkerson submitted interrogatories to Lee Fischer, M.D., an impartial medical expert, for the purpose of obtaining additional medical testimony. Plaintiff requested a supplemental hearing, which was held on March 16, 2012. Dr. Fischer appeared and provided testimony, as did Plaintiff and a second vocational expert. (Tr. 35-51). On April 6, 2012, the ALJ issued an unfavorable written decision. (Tr. 10-23). The Appeals Council denied review, leaving the ALJ's opinion as the Commissioner's final decision.

Plaintiff was 43 years old and in the "younger individual" category on her alleged disability onset date. She has a limited education, has not worked since her alleged disability onset date, and can no longer perform her past relevant work in computer sales. (Tr. 22). In addition to finding that Plaintiff suffers from the severe impairment of interstitial cystitis of the bladder and kidneys, the ALJ found that Plaintiff suffers from the following severe impairments: "irritable bowel syndrome (IBS); migraines, mild degenerative changes of the thoracic and lumbar spines; plantar fasciitis; adjustment disorder/depression; and panic disorder without agoraphobia." (Tr. 13). Determining that none of her impairments or combination of impairments met or medically equaled any listed impairment in the regulatory scheme, *see* 20 C.F.R. Part 404, Subpt. P, Appx. 1, the ALJ next evaluated Plaintiff's residual functional capacity ("RFC"). (Tr. 15-16).

The ALJ concluded that Plaintiff maintains the RFC to perform light work, except that:

> she can never climb ladders, ropes, or scaffolds, she needs to avoid unprotected heights and very loud noise. The claimant needs access to a restroom and [to] be able to use it briefly as needed, typically every one to two hours. The claimant is able to perform simple, routine tasks in a low

2

stress environment, with minimal contact with others.

(Tr. 16). After considering Plaintiff's age, education, work experience and RFC and hearing testimony from the VE, the ALJ determined that there are unskilled jobs that exist in significant numbers in the national economy that Plaintiff can perform, including housekeeper/cleaner, folder, and shirt presser. (Tr. 23). Therefore, the ALJ found that Plaintiff is not disabled.

In contrast to the ALJ's determination, Plaintiff claims that she is disabled due to the symptoms of her IC, particularly her urinary frequency. She asserts that the ALJ erred: (1) in failing to give controlling weight to the disability opinions of two treating physicians and greater weight to the opinion of an examining psychologist, and instead giving the most weight to non-examining consultants; (2) in failing to adequately consider SSR 02-2p when evaluating her IC; and (3) in improperly assessing Plaintiff's credibility.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant

3

evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion . . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Com'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920. A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R.

4

§404.1512(a).

### B. Specific Errors

All three of the errors alleged by Plaintiff concern the ALJ's evaluation of her interstitial cystitis, which Plaintiff testified causes her to have to use the bathroom as many as twenty times in a single hour, and which allegedly causes numerous other symptoms such as pain, fatigue, and depression. For the convenience of the Court, the undersigned discusses the errors in a different order than presented by Plaintiff.

### 1. Social Security Ruling 02-2p

The parties agree that there is no Listing for urological conditions. Nevertheless, Plaintiff argues that she should have been found to be disabled under the guidance of SSR 02-2p. The Commissioner does not fully address Plaintiff's arguments under SSR 02-2p. Rather, in a single sentence referring to the Ruling, the Commissioner suggests only that the medical evidence does not support the type of urinary frequency documented in SSR 02-2p. (Doc. 15 at 7).

Following the first hearing, the ALJ submitted written interrogatories to Medical Expert ("ME") Lee Fischer, M.D. According to his resume, Dr. Fischer practices in the area of family medicine; he is not a specialist in urology as is one of Plaintiff's treating physicians. Dr. Fischer's responses to the written interrogatory questions do not contain any reference to SSR 02-2p. His August 12, 2011 responses reflect that he considered only Listings 1.02 and 1.04, which are not particularly relevant to Plaintiff's IC claims.

In his written responses, Dr. Fischer acknowledged the Plaintiff's "primary condition is interstitial cystitis," which he describes as "primarily a chronic pain syndrome" diagnosed and treated "primarily….on patient's subjective complaints." (Tr.

5

742). He refers to medical records in which Plaintiff reported urinary frequency of "every 1-2 hours." (*Id.*).  He opines that, although the evidence supports the diagnosis of IC based upon reported symptoms, consistent use of narcotics, and "moderate to severe bladder changes" seen on exam, Plaintiff's IC should not cause <u>any</u> significant functional limitations other than requiring access to a bathroom "as needed, typically every 1-2 hours." (Tr. 742-743).

At the second evidentiary hearing held in March 16, 2012, Dr. Fischer affirmed his opinions, again without reference to SSR 02-2p.  He declined to offer any opinion on Plaintiff's alleged depression or psychological symptoms that might result from IC, indicating "I can't answer.  That requires a psychologist."  (Tr. 45; *see also* Tr. 46). When asked why he disagreed with long-term treating physician Dr. Matunis concerning whether Plaintiff was disabled from IC, he further opined:

> [M]ost people with interstitial cystitis 365 days a year do not have to go to the bathroom every five to 10 minutes.  It's just – that's not the nature of the illness.  In fact…her bladder when they first looked in there was fine. When they distended it with urine, they showed some changes from interstitial cystitis.  So if she emptied her bladder frequently that should – one would expect that to alleviate some of the symptoms.….

(Tr. 44).

In other words, both Dr. Fischer's interrogatory answers and his oral testimony confirm that he based his opinion on his understanding of the symptoms of "most people with interstitial cystitis" without any reference to SSR 02-2p or particular familiarity with IC.  While it is not necessarily reversible error for an ALJ to fail to explicitly reference a Social Security Ruling in making a disability determination, the ALJ's analysis must at least be consistent with relevant regulations and rulings.  Here, Plaintiff's counsel specifically alerted the ALJ to the SSR 02-2p issue in correspondence requesting a second hearing.  Yet, the ME's testimony on which the ALJ so heavily

6

relied, as related to mental limitations and the presumption that symptoms would be alleviated if Plaintiff would empty her bladder 'frequently' but not more than once or twice per hour, is contrary to SSR 02-2p.  Based upon the record presented, the undersigned concludes that the ALJ's failure to obtain evidence that more specifically considered the guidance of SSR 02-2p and/or overreliance upon Dr. Fischer amounts to a failure of substantial evidence to support the non-disability finding, requiring remand.

Like fibromyalgia, interstitial cystitis is a diagnosis of exclusion that primarily affects women.  Social Security Ruling 02-2p was published on November 5, 2002 in order to provide additional guidance in the evaluation of this "complex, chronic bladder disorder." The ruling makes clear that "when accompanied by appropriate symptoms, signs, and laboratory findings," IC <u>alone</u> "can be the basis for a finding of 'disability.'" (See Tr. 335, SSR 02-2p).

> If an individual has the medically determinable impairment IC that is "severe" …, we may find that the IC medically equals a listing, if appropriate. … We also may find…that the IC results in a finding that the individual is disabled based on his or her residual functional capacity (RFC), age, education, and past work experience.
>
> An individual with IC also may report symptoms suggestive of a mental impairment (for example, the individual may say that he or she is anxious or depressed, having difficulties with memory and concentration, etc.).  If the evidence supports a possible discrete mental impairment or symptoms such as anxiety or depression resulting from the individual's IC or the side effects of medication, we will develop the possible mental impairment.  If the evidence does not establish a medically determinable mental impairment, but does establish the presence of symptoms such as anxiety or depression resulting from …IC or side effects of medication, we will determine whether there are any work-related functional limitations….

(Tr. 338).  The ruling also explains how IC might require a presumption of disability "equivalent" to a listing in severe cases:

> [W]e will find that an individual with IC "meets" the requirements of a listing if ….there is an impairment that, in combination with IC, meets the requirements of a listing.  For example, IC may increase the severity of

7

> coexisting or related impairments, including mental disorders, to the extent that the combination of impairments meets the requirements of a listing. This also may be true in the reverse, coexisting or related impairments may increase the severity of IC.
>
> We also may find that IC, by itself, is medically equivalent to a listed impairment….
>
> We also will find equivalence if an individual has multiple impairments, including IC, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment.
>
> However, we will not make assumptions about the severity or functional effects of IC combined with other impairments. IC in combination with another impairment may or may not increase the severity or functional limitations of the other impairment….
>
> [W]e will never deny an individual's claim because the individual's IC does not meet or medically equal a listing. If an individual with IC has a severe impairment that does not meet or medically equal a listing, we may still find the individual disabled based on other rules in the "sequential evaluation process"….

(Tr. 338-339).

While the above language is useful in terms of context and background, in this case, Plaintiff does not so much argue for an "equivalence" ruling under Step 3, as much as she advocates for an RFC that precludes all work based upon her IC symptoms and limitations. SSR 02-2p also contains explicit guidelines concerning RFC findings under Steps 4 and 5 of the sequential analysis, which guidance does not appear to have been followed by Dr. Fischer or the ALJ in this case:

> IC can cause limitation of function. The functions likely to be limited depend on many factors, including urinary frequency and pain. *An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting carrying, pushing, and pulling.* It may also affect ability to do postural functions, such as climbing, balancing, stooping, and crouching. The ability to tolerate extreme heat, humidity, or hazards also may be affected.
>
> *The effects of IC may not be obvious. For example, many people with IC have chronic pelvic pain, which can affect the ability to focus and sustain*

8

> *attention….Nocturia…may disrupt sleeping patterns.* This can lead to drowsiness and lack of mental clarity during the day. *IC also may affect an individual's social functioning.* The presence of urinary frequency alone can necessitate trips to the bathroom as often as every 10 to 15 minutes, day and night. Consequently, *some individuals with IC essentially may confine themselves to their homes.* In assessing RFC, we must consider all of the individual's symptoms in deciding how such symptoms may affect functional capacities.
>
> …Individuals with IC may have problems with the ability to sustain a function over time.
>
> As explained in SSR 96-8p…, our RFC assessments must consider an individual's maximum remaining ability to do sustained work activities…on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or equivalent work schedule. *In cases involving IC, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving urinary frequency.*

(Tr. 339-340)(italics added).

Contrary to the above, not only did Dr. Fischer profess to have no understanding of any related psychological or mental impairments resulting from chronic pain, disruption of sleep from nocturia and/or medications, but he also explicitly rejected the opinion of Plaintiff's long-term treating physician that her fatigue, medication side effects, and severity of IC resulted in physical functional impairments relating to her abilities to sit, stand, and walk. Dr. Fischer's testimony reflects that the primary reason he rejected Dr. Matunis's RFC opinion was his lack of understanding that IC could cause physical limitations other than a need to use the bathroom every one or two hours. "I'm looking at the physical functional capacity evaluation [by Dr. Matunis] that was filled out, sit, stand, and walk less than two hours each. I mean that would, that would presume that she be [sic] in bed the whole rest of the day and I don't believe that she has significant back trouble or other musculoskeletal conditions that would limit her to sitting and standing less than two hours per day." (Tr. 44).

9

As with fibromyalgia, the diagnosis of "severe" IC is not always disabling. The difficulty in this case is that Dr. Fischer, the ME upon whom the ALJ so heavily relied, does not appear to have considered or even to have been familiar with the detailed guidance offered by SSR 02-2p. That failure requires remand. *Accord Roush v. Barnhart*, 326 F. Supp.2d 858 (S.D. Ohio 2004)(remanding where ALJ failed to give controlling weight to opinion of treating urologist and failed to properly evaluate Plaintiff's IC in view of SSR 02-2p; ALJ also improperly rejected Plaintiff's testimony concerning her urinary frequency); *Capshaw v. Com'r of Soc. Sec.*, 2013 WL 4667544 (E.D. Mich., Aug. 30, 2013)(same); *Chavis v. Astrue*, 2012 WL 5306130 (S.D. Ohio, Oct. 25, 2012)(remand for consideration of SSR 02-2p); *Labanderia v. Astrue*, 2010 WL 1963426, *1 (S.D. Ohio May 17, 2010)(remand where ALJ may not have accepted SSR 02-2p's premise that IC alone may be totally disabling, that there may be a psychological component to IC, and/or that frequency and other symptoms may make work impossible); *contrast Smith v. Astrue*, 2009 WL 2733827 (S.D. Ohio, Aug. 26, 2009)(affirming where IC not disabling).

**2. Weight Given to Opinion Evidence**

In a related argument, Plaintiff contends that the ALJ should have given controlling weight to the opinions of her two treating physicians: Drs. Buffington and Matunis. The ALJ rejected their opinions in favor of the opinion of Dr. Fischer. Plaintiff additionally argues that the ALJ erred by giving greater weight to the opinion of a non-examining consultant over the opinion of an examining psychological consultant, Dr Murphy.

**a.  Treating Physician Opinions**

The relevant regulation regarding treating physicians provides: "If we find that a

10

treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. §404.1527(c)(2); *see also Warner v. Com'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004). The reasoning behind what has become known as "the treating physician rule" has been stated as follows:

> [T]hese sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)(quoting former 20 C.F.R. § 404.1527(d)(2)). Thus, the treating physician rule requires the ALJ to generally give "greater deference to the opinions of treating physicians than to the opinions of non-treating physicians." *See Blakley v. Com'r of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009). If an ALJ does not give controlling weight to a treating physician's opinion, he or she must articulate the weight given to the opinion, and provide "good reasons" for that decision.

> If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician.

*Blakley v. Com'r of Soc. Sec.*, 581 F.3d at 406 (additional citations omitted). In addition, the opinions of examining consultants are generally entitled to greater weight than are the opinions of non-examining consultants. *See* 20 C.F.R.§1527(c)(1); *see also Gayheart v. Com'r*, 710 F.3d 365, 375-376 (6th Cir. 2013). Plaintiff argues that the

11

reasons provided by the ALJ do not satisfy the "good reasons" standard contained in 20 C.F.R. §404.1527(c)(2).

Both of Plaintiff's treating physicians, a primary care physician with whom she has treated for more than 10 years, and a urologist with whom she has treated since January of 2008, opined that Plaintiff is completely disabled from full-time work due to her IC. Dr. Matunis opined in a physical RFC dated July 28, 2011 that Plaintiff suffers from medication side effects of sleepiness and drowsiness, which, in combination with Plaintiff's severe pain (primarily from IC), resulted in a limited ability to focus, concentrate and deal with stress. (Tr. 753-754). However, Dr. Matunis also reported that Plaintiff's symptoms were temporarily improved with treatment. Dr. Matunis opined that Plaintiff was limited to sitting for less than 2 hours a day, and to standing and/or walking for less than two hours per day, requiring 5-10 minute unscheduled breaks every 30-60 minutes. (Tr. 754). On March 9, 2012, Dr. Matunis opined in a brief narrative statement that Plaintiff was disabled due to her severe chronic instital cystitis and major depression, again citing chronic pain and medication side effects as causing fatigue at a level that renders her incapable of sustaining full-time work. (Tr. 758).

Dr. Buffington, Plaintiff's urologist, similarly opined on May 23, 2011 that Plaintiff is disabled by her severe IC symptoms. He stated that Plaintiff suffers from severe urinary frequency and urgency, bladder and pelvic pain, suprapubic abdominal pain, vaginal pain, sleep interruption from nocturia, and moderate depression. (Tr. 659). He opined that she was limited to four hours of work per day, sitting only 30 minutes at a time, and not more than 4 hours total in a day, standing no more than 15 minutes at a time or up to 2 hours per day, and lifting not more than 10 pounds occasionally and 5 pounds frequently. (Tr. 616-618).

The ALJ rejected the functional limitations offered by these two treating physicians:

> The undersigned gives Dr. Buffington and Matunis' assessments limited weight, as the record as a whole supports that with treatment and medication, the claimant's symptoms are under control.  Further, diagnostic testing has shown that the claimant's back and foot impairments are not of the severity that would produce the limitations described by these assessments and that the claimant ambulates effectively.  Further, it appears that the claimant's mental symptoms are generally dependent on her physical condition.  In any case, her mental symptoms have not reached the level of severity where she has the need for mental health therapy or additional medications other than her low dose Xanax.

(Tr.19).

Plaintiff argues persuasively that no records reflect that her symptoms were ever fully "under control," nor did her treating physicians so indicate.  For example, she points to a flare-up of IC symptoms on September 4, 2009 (just before her onset date) at which she had urinary frequency every hour, requiring treatment with an infusion of lidocaine into her bladder on that date.  (Tr. 440, 442).  On October 30, 2009, Dr. Buffington performed the same procedure for the same symptoms.  (Tr. 435-437).  Plaintiff also cites to many 2008 records that reflect urinary frequency of every 20-30 minutes.  However, in 2008 she admittedly was still employed and not disabled.  In April 2009, she reported frequency as every hour (a decrease compared to 2008), nocturia 4 times per night, and pain.  From July through September 2009, she continued to complain of frequency at a rate of every hour.  (Tr. 432-472).  Despite that reported frequency, Plaintiff continued to work and does not claim to be disabled prior to October 2009.  In January 2010, Dr. Buffington performed a urethreal diverticulectomy on Plaintiff due to worsening symptoms, following an ER visit by Plaintiff on January 18, 2010.  Plaintiff next sought ER treatment for a flare-up on September 12, 2010.  (Tr.

13

652-657). Plaintiff testified that she could not afford continued frequent treatment from Dr. Buffington, despite her allegedly severe symptoms. At her most recent hearing in March 2012, she testified that her symptoms had continued to worsen over time, including but not limited to frequent infections that occur as a side effect of her IC, fatigue, pain, and depression.

In light of the prior discussion of SSR 02-2p, the ALJ's nearly wholesale rejection of the RFC assessments of Plaintiff's treating physicians cannot be said to be supported by substantial evidence. For example, the comment that "the claimant's mental symptoms are generally dependent on her physical condition," while perhaps accurate, reflects only the close interplay between Plaintiff's IC and her depression as discussed by the Ruling, and does not offer a basis for stating that she has no functional limitations resulting therefrom.

On the other hand, the evidence of the severity of Plaintiff's symptoms is not uniform throughout time but indeed, as the ALJ noted, quite variable. In other words, there is some medical evidence in the records of both treating physicians that supports a conclusion that, at least at times, Plaintiff's symptoms were less severe. The Commissioner argues strenuously that over time, Plaintiff's reported urinary frequency decreased rather than increased, even though the record contains some reports (such as prior to a 2011 procedure) of frequency every 15 minutes.[1] Based on these types of ambiguities, remand for additional review rather than reversal for an award of benefits is the most appropriate action in this case.

---

[1] Frequency is but one of the symptoms of IC and her medications that Plaintiff alleges result in her inability to sustain full-time work.

### b. Examining Consultant Dr. Murphy

The ALJ noted that Plaintiff has been prescribed a low dose of Xanax by Dr. Minutis, but that she has not otherwise sought treatment from a mental health professional. Dr. Murphy performed a consultative psychological examination in March 2010. She diagnosed Plaintiff with an adjustment disorder with mixed anxiety and depressed mood, and panic disorder without agoraphobia, and assessed Plaintiff as suffering from moderate symptoms in all four functional areas. Non-examining psychological consultant Dr. Hoyle reviewed Dr. Murphy's complete examination report along with other medical records and stated that she was giving "weight to the opinions of the examiner [Dr. Murphy]" and that Plaintiff's statements "are credible." Without explanation for any disagreement with Dr. Murphy, Dr. Hoyle went on to complete a mental RFC that rated Plaintiff as only "mildly" rather than "moderately" impaired in activities of daily living. Dr. Hoyle also found Plaintiff to be only "moderately" rather than "moderate to seriously impaired" in her ability to withstand the stress and pressure of work. Other than the referenced discrepancies, Dr. Hoyle's assessment agreed with Dr. Murphy's report in finding "moderate" impairments.

The ALJ partially agreed with Dr. Murphy, but gave greater weight to Dr. Hoyle's conclusions that Plaintiff was only mildly impaired in activities of daily living, and that Plaintiff could perform "simple, routine tasks in a low stress environment with minimal contact with others." (Tr. 21, citing Tr. 514). The ALJ reasoned that Dr. Hoyle's assessment was "consistent with the evidence as a whole, including Drs. Matunis and Buffington's residual functional capacities that found the claimant moderately impaired mentally." (Tr. 21).

Plaintiff suggests that it was error for the ALJ to fail to "mention that Dr. Murphy's

15

opinion of moderate to seriously impaired ability to withstand the stress and pressure associated with day-to-day work activity." (Tr. 495). Plaintiff complains that the ALJ "doesn't say why" Dr. Hoyle's assessment is given greater weight than Dr. Murphy's assessment. (Doc. 13 at 10). Because SSR 02-2p requires the assessment of Plaintiff's mental impairment in the context of her IC, and because neither Dr. Hoyle nor the ALJ explain the basis for diverging from Dr. Murphy's opinions concerning Plaintiff's limitations, remand is also required for this asserted error.

### 3. Subjective Complaints of Pain - Credibility

Last, Plaintiff complains that the ALJ's credibility assessment is not supported by substantial evidence. An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Further, a credibility determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Thus, it is proper for an ALJ to discount the claimant's testimony where there are contradictions among the medical records, his testimony, and other evidence. *Warner v. Com'r of Soc. Sec.*, 375 F.3d at 387, 392 (6th Cir. 2004).

In his decision, the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr.18). The ALJ's failure to consider SSR 02-2p and improper evaluation of the medical evidence likely influenced the credibility finding in this case. Therefore, the ALJ should reevaluate Plaintiff's credibility on remand.

16

### III. Conclusion and Recommendation

For the reasons discussed above, the undersigned finds that remand is required. Therefore, **IT IS RECOMMENDED THAT** Defendant's decision be **REVERSED** and remanded to the Commissioner for further review under sentence four of 42 U.S.C. §405(g), in accordance with this Report and Recommendation. As no other matters remain pending, this case should be **CLOSED**.

*s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| CHANTAY ELESE COLLINS, | Case No: 1:13-cv-756 |
| Plaintiff, | Barrett, J. |
| v. | Bowman, M.J. |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).